1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

RICHARD BACH, et al.,

8                                Plaintiffs,

9        v.

10      FOREVER LIVING PRODUCTS U.S., INC., et
        al.,

11

12                               Defendants.

No. C05-970MJP

ORDER DENYING DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT ON PLAINTIFFS'
TRADEMARK CLAIMS

13

14      This matter comes before the Court on Defendants' motion for partial summary judgment

15 denying Plaintiffs' trademark claims. (Dkt. No. 69).  Plaintiffs oppose the motion. (Dkt. No. 76).

16 Having considered the parties' briefs, including the supplemental briefs, (Dkt. Nos. 125 & 129), as

17 well as all of the documents submitted in support thereof, the Court DENIES Defendants' motion.

18 The Court also DENIES Defendants' motion to exclude the expert survey of Kenneth Hollander.

19 (Dkt. No. 82).

20                                    **BACKGROUND**

21      This case arises from Defendants' use of the title, character, name, text, and photographs

22 associated with the book Jonathan Livingston Seagull.  The book was written by Richard Bach and

23 was published in 1970.  The photographs which appear in the book were taken by Russell Munson.

24 Mr. Bach and Mr. Munson are the plaintiffs in this case.

25      Defendants Forever Living Products U.S., Forever Living Products International, and Aloe

26 Vera of America (collectively "Forever Living Products" or "FLP") are affiliated companies that

manufacture and distribute health and beauty products through "direct sales" or "multi-level

marketing," in a fashion similar to that used by the company Avon. (Lloyd Decl. ¶ 2). The name "Forever Living Products" also refers to over 150 domestic and foreign affiliated businesses that sell and distribute Forever Living health and beauty products. (Id.). Defendant Forever Resorts provides management services for resorts located in the United States. (Id. ¶ 6). Rex Maughan is the founder, CEO, and President of FLP and is a manager of Defendant Forever Resorts. Rex Maughan also has an ownership interest in substantially all of the 100+ foreign affiliates of Forever Living Products. (Id. ¶ 9).

Plaintiffs allege that Defendants have used a copyrighted photograph from Jonathan Livingston Seagull as their corporate logo, and have used copyrighted excerpts from Jonathan Livingston Seagull, and the copyrighted story and character of Jonathan Livingston Seagull in their advertising, promotional, and training materials, in communications with their independent distributors, in their sale and distribution of FLP products, and in the advertising, marketing and promotion of Forever Resorts recreational properties. (Third Am. Compl. ¶ 4). Plaintiffs allege that these uses constitute copyright infringement in violation of the Copyright Act, 17 U.S.C. § 501.

Plaintiffs also allege that Defendants have falsely represented in commerce that their companies, products, and services are endorsed by or otherwise affiliated or associated with the name, title, and images associated with Jonathan Livingston Seagull and/or Plaintiffs. (Third Am. Compl. ¶ 5). The record is replete with examples of how Defendants used the name and title of Jonathan Livingston Seagull, as well as the image of a white seagull on a blue background, in their written and oral business communications. For example, in a 2003 promotional video, FLP's marketing director stated that FLP's brand is "the Jonathan brand," and that "Jonathan is really the basis of what Forever is about." (Geyman Decl., Ex. 13). FLP has referred to the company logo — a seagull — by the name "Jonathan" or "Jonathan Livingston Seagull" since the company was founded in 1978. (Geyman Decl., Exs. 16-17). For over twenty years, FLP has given "Jonathan" bonuses to successful distributors. (Id., Ex. 18). FLP has given statues of "Jonathan Livingston Seagull" to top-selling distributors, (Id., Ex. 21) called its distributors "Jonathans", (Id., Ex. 22) and held "Jonathan Days" and "Super Jonathan Days" to motivate its distributors (Id., Exs. 19 & 23). Moreover, FLP

1   has used the image of a white seagull on a blue background — an image strikingly similar to the cover

2   of the U.S. edition of the book — on FLP sales folders. (Id., Ex. 29).  And in a 2005 "Style Guide",

3   FLP outlined how the same image of a white seagull on a blue background was to be used in FLP

4   signs, flags, and banners. (Id., Ex. 14).  Plaintiffs allege that these uses constitute trademark

5   infringement in violation of the Lanham Act, 15 U.S.C. §1125(a).

6       Defendants have moved for summary judgment on Plaintiffs' trademark claims.  FLP argues

7   that Plaintiffs' trademark claims should be denied for two reasons: (1) the copyright and trademark

8   claims overlap and courts do not allow trademark claims to proceed where copyright provides an

9   adequate remedy, and (2) Plaintiffs cannot establish infringement of their trademark rights.

10                                    **ANALYSIS**

11  **A.    Motion to Exclude**

12      Defendants have moved to exclude one of the surveys relied upon by Plaintiffs to show

13  likelihood of confusion.[1] (Dkt. No. 82).  Under Fed. R. Evid. 702, expert testimony is admissible if

14  (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable

15  principles and methods, and (3) the witness has applied the principles and methods reliably to the

16  facts of the case.  Expert testimony is admissible if the expert is qualified to testify on the matters at

17  issue and the testimony is relevant and reliable. See Daubert v. Merrell Dow Pharmaceuticals, Inc.,

18  509 U.S. 579, 598 (1993).  Under Fed. R. Evid. 403, evidence may be excluded if its probative value

19  is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading

20  the jury.  The Ninth Circuit has held that, in the context of consumer confusion surveys, "as long as

21  they are conducted according to accepted principles, survey evidence should ordinarily be found

22  sufficiently reliable under Daubert." Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1143

23  n.8 (9th Cir. 1997) (quoting E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1292 (9th Cir.

24

25  ───────────────

26      [1]    Under Local Civil Rule 7(g), Defendants' motion should have been presented as part of
    Defendants' reply brief, and not as a separate motion to exclude.  Nevertheless, the Court will consider
    the substance of the motion.

ORDER - 3

1   1992)).  Moreover, "[t]echnical unreliability goes to the weight accorded a survey, not its

2   admissibility." Id. at 1143 (quoting E & J Gallo Winery, 967 F.2d at 1292).

3        The at-issue survey is an internet survey conducted by Kenneth Hollander that tested 200

4   individuals who identified themselves as being past, current, or potential multi-level marketing

5   distributors. (Hollander Decl. ¶ 11).  The survey respondents were divided into test and control

6   groups. (Id. ¶ 13).  Both groups were shown the same visual array depicting the name, title, and

7   cover image of a seagull from the book Jonathan Livingston Seagull. (Id. ¶ 14).  The test group was

8   shown a second visual array depicting six examples of FLP's alleged confusing uses of Plaintiffs'

9   marks. (Id. ¶ 15).  The control group was shown the same six examples of FLP's uses, except that all

10  references to Jonathan Livingston Seagull and all seagull images were removed. (Id. ¶ 16).  All of the

11  respondents were then asked whether they thought "that the corporation that manufactures and

12  distributes Forever Living Products around the world did or did not [or did not or did] get permission

13  from the people who own the rights to Jonathan Livingston Seagull." (Id. ¶ 17).  The survey asked a

14  follow-up question to those who answered "did" to the question. (Id. ¶ 19).  Thirty-five of the 100

15  respondents in the test group (35%) and four of the respondents in the control group (4%) thought

16  that FLP had received permission from the owners of the rights to Jonathan Livingston Seagull. (Id. ¶

17  22).

18       Defendants do not challenge Mr. Hollander's qualifications as an expert.  Instead, Defendants

19  argue that the survey should be excluded under Rules 702 and 403 because it is not based on reliable

20  survey methods, has no probative value, and will confuse the jury.  First, Defendants challenge the

21  relevance of the Hollander survey on the grounds that the survey asked respondents whether they

22  believed that FLP had "permission" to use the JLS marks, rather than "approval" to use the marks.

23  But, as Plaintiffs point out, whether a defendant has permission to use a plaintiff's mark is probative

24  of and relevant to the likelihood of confusion question.  See Pebble Beach Co. v. Tour 18 I, Ltd., 155

25  F.3d 526, 543-44 (5th Cir. 1998) ("For a party to suggest to the public, through its use of another's

26  mark or a similar mark, that it has received permission to use the mark on its goods or services

ORDER - 4

suggests approval, and even endorsement, of the party's product or service and is a kind of confusion the Lanham Act prohibits.").

Next, Defendants challenge the reliability of the Hollander survey because (1) Hollander surveyed the wrong universe; (2) the survey design used images that were not seen in actual commerce and some of the images were never used by Defendants; (3) the survey employed leading questions; (4) the survey failed to control for biases; and (5) Hollander did not take any validation measures to confirm that survey participants were a part of the intended universe. These criticisms, to the extent they have merit, go to the weight that should be afforded Mr. Hollander's survey, not to its admissibility.  See Southland Sod Farms, 108 F.3d at 1143 (holding that objections based on the universe of survey participants and the use of leading questions went only to the weight, and not the admissibility, of the survey).  Defendants may challenge the Hollander survey through cross-examination and the presentation of contrary evidence at trial, but the Court will not exclude the survey in its entirety.  Defendants' motion to exclude is therefore DENIED.

**B.      Standard on Summary Judgment**

Summary judgment is not warranted if a material issue of fact exists for trial.  Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied, 516 U.S. 1171 (1996).  The underlying facts are viewed in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  "Summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The party moving for summary judgment has the burden to show initially the absence of a genuine issue concerning any material fact.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970).  However, once the moving party has met its initial burden, the burden shifts to the nonmoving party to establish the existence of an issue of fact regarding an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  To discharge this burden, the nonmoving party cannot rely on its pleadings, but instead must have evidence showing that there is a genuine issue for trial.  Id. at 324.

## C.    Plaintiffs' Trademark Claims Do Not Overlap with Their Copyright Claims

Defendants argue that Plaintiffs cannot bring their trademark claims because copyright law provides an adequate remedy.  Stated differently, Defendants argue that Plaintiffs "cannot piggyback trademark claims in a copyright case." (Mot. at 5).  Plaintiffs argue that there is no such piggybacking here.  They argue that although "the facts concerning FLP's theft are the same . . . Plaintiffs' trademark and copyright claims protect fundamentally different aspects of the intellectual property that FLP has expropriated." (Resp. at 10).

The Supreme Court has cautioned "against misuse or over-extension of trademark and related protections into areas traditionally occupied by patent or copyright."  Dastar v. Twentieth Century Fox Film Corp., 539 U.S. 23, 34 (2003) (internal quotation marks omitted).  In Dastar, the Supreme Court declined to recognize a "reverse passing off"[2] cause of action where a producer made minor edits to a television series that had been, but was no longer, protected by copyright, and released the series as its own.  The Supreme Court held that the "origin of goods" provision in section 43(a) of the Lanham Act does not contain a cause of action for plagiarism.[3]  Id. at 36-37.  It explained that "[t]o hold otherwise would be akin to finding that § 43(a) [of the Lanham Act] created a species of perpetual patent and copyright, which Congress may not do."  Id. at 37.

Similarly, in Shaw v. Lindheim, 919 F.2d 1353 (9th Cir. 1990), one screenplay writer alleged that another writer had copied his script and developed it into a television series.  Shaw, 919 F.2d at 1355.  The Ninth Circuit declined to recognize a "reverse passing off" claim because the plaintiff's claim was "not consistent with the Lanham Act's purpose of preventing individuals from misleading the public by placing their competitors' work forward as their own."  Id. at 1364.  The court thus

---

[2]    "Reverse passing off" is defined as "removing or obliterating the original trademark without authorization before reselling goods produced by someone else."  Shaw v. Lindheim, 919 F.2d 1353, 1364 (9th Cir. 1990).

[3]    Under section 43(a) of the Lanham Act, a person who makes a misrepresentation which is likely to cause confusion as to the "origin . . . of . . . his or her goods" is liable in a civil action.  See 15 U.S.C. § 1125(a).  In Dastar, the Supreme Court concluded that the phrase "origin of goods" "refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods."  Dastar, 539 U.S. at 37.

"decline[d] to expand the scope of the Lanham Act to cover cases in which the Federal Copyright Act provides an adequate remedy." Id. at 1364-65; see also Corbis Corp. v. Amazon.com, Inc., 351 F. Supp. 2d 1090, 1116-17 (W.D. Wash. 2004) (rejecting reverse passing off claim that Amazon displayed plaintiff's photographic images without crediting plaintiff because plaintiff's claim was basically a copyright claim).

Trademark and copyright law have fundamentally different purposes. "Trademark law is concerned with the protection of symbols, elements or devices used to identify a product in the marketplace and to prevent confusion as to its source." RDF Media Ltd. v. Fox Broad. Co., 372 F. Supp. 2d 556, 563 (C.D. Cal. 2005) (quoting EMI Catalogue Partnership v. Hill, Holliday, Connors, Cosmopolos, Inc., 228 F.3d 56, 63 (2d Cir. 2000)). In contrast, copyright law "protects the artist's right in an abstract design or other creative work." Id. Therefore, trademark law protects the distinctive source-distinguishing mark, while copyright law protects the work as a whole. See Whitehead v. CBS/Viacom, Inc., 315 F. Supp. 2d 1, 13 (D.D.C. 2004).

The fact that the two areas of law protect against different wrongs is reflected in the many cases in which courts have analyzed the same set of facts under both trademark and copyright law without concluding that the trademark claims were "piggybacking" on the copyright claims. See Mattel Inc. v. Walking Mountain Prods., 353 F.3d 792 (9th Cir. 2003) (holding that artist who developed series of photographs which depicted Barbie in various absurd positions did not violate Mattel's copyright or trademark rights in Barbie doll); Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc., 109 F.3d 1394 (9th Cir. 1997) (affirming grant of preliminary injunction prohibiting the publication of *The Cat NOT in the Hat! A Parody by Dr. Juice*, a rhyming summary of highlights from the O.J. Simpson trial, as violating Dr. Seuss's copyright and trademark rights); Nintendo of Am., Inc. v. Dragon Pacific Int'l, 40 F.3d 1007 (9th Cir. 1994) (affirming district court's award of damages under both copyright and trademark law where defendant copied Nintendo games (copyright infringement) and then sold the games as a package, but advertised that they were Nintendo products (trademark violation)); Toho Co., Ltd. v. William Morrow & Co., 33 F. Supp. 2d 1206 (C.D. Cal. 1998) (issuing preliminary injunction based on plaintiff's likelihood of success on

both trademark and copyright claims where publisher was about to release book entitled "Godzilla" (trademark violation) that included images and photographs from original Godzilla film as well as descriptions of the character of Godzilla (copyright violations)).

Here, FLP argues that the claims overlap because the complaint relies on similar factual allegations of copying for both its trademark and copyright claims.  But as Plaintiffs point out, Plaintiffs are seeking remedies for distinct wrongs under each legal framework.  Plaintiffs' rights in the <u>name</u> and <u>title</u> of Jonathan Livingston Seagull and the <u>trade dress</u> of the book cover (a white seagull in silhouette against a blue background) are protected under trademark law, not copyright law, because it is the name, title, and trade dress that are the source-identifying marks associated with Plaintiffs.  And Plaintiffs' rights in the JLS <u>character</u>, the <u>photograph</u> that FLP used as its logo, and the portions of the copyrighted <u>text</u> used by FLP, are protected under copyright law, not trademark law, because the character, text, and images in <u>Jonathan Livingston Seagull</u> are the artists' creative work.

Plaintiffs' claims sound in both trademark and copyright law.  This is not a case like <u>Dastar</u> or <u>Shaw</u> where the plaintiffs were attempting to use trademark law to prosecute plagiarism of their creative work.  The Court will therefore consider the merits of Plaintiffs' trademark claims.

**D.    Trademark Infringement**

Plaintiffs' false association claims are based on section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which provides, in relevant part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which — (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

To prevail on a claim of trademark infringement in violation of the Lanham Act, a plaintiff must show that he has a valid, enforceable mark entitled to protection under the Act, and that the defendant's use of the mark creates a likelihood of confusion. See <u>Brookfield Commc'ns, Inc. v.</u>

ORDER - 8

West Coast Entm't Corp., 174 F.3d 1036, 1046 (9th Cir. 1999).  Defendants argue that Mr. Bach

does not own any of the trademarks associated with Jonathan Livingston Seagull and that Plaintiffs

have not shown any likelihood of confusion.[4]

**1.      Ownership of Trademark Rights**

Plaintiffs never registered any trademarks in connection with Jonathan Livingston Seagull.

(See McDougall Decl., pp. 39-40 (Bach Dep.)).  Where no trademark has been registered, the

plaintiff bears the burden of proof as to the validity and protectability of the unregistered marks.

Yellow Cab of Sacramento v. Yellow Cab of Elk Grove, Inc., 419 F.3d 925, 927 (9th Cir. 2005).

In 1972, Mr. Bach and Hall Bartlett executed a "Literary Purchase Agreement" ("LPA") that

granted Mr. Bartlett motion picture rights in Jonathan Livingston Seagull. (McDougall Decl. ¶¶ 14,

30, pp. 207-223 [hereinafter "LPA"]).  FLP argues that this agreement constituted a sale or, at the

very least, a "naked license" of Plaintiffs' trademark rights in Jonathan Livingston Seagull.  Plaintiffs

dispute these arguments.

**a.      Mr. Bach did not sell or assign the trademark rights to the <u>Jonathan Livingston Seagull</u> name and title.**

Because trademarks are property, they may be bought, sold, and licensed.  See 3 J. McCarthy,

Trademarks and Unfair Competition, § 18:1 (4th ed. 2004).  FLP argues that Mr. Bach sold all of his

rights in the JLS name and title to Bartlett through the LPA.  FLP highlights particular phrases in the

LPA that suggest an assignment of rights.  But read as a whole, the LPA limits the rights assigned

only to motion picture rights and merchandising rights in association with the motion picture rights.

The LPA is therefore a license, not an assignment of all rights.  See 3 McCarthy, supra, § 18.1

(distinguishing between assignment of a mark which is an outright sale of all rights in that mark and a

license of a mark, which is a limited permit to another to use the mark).

---

[4]      Defendants also argued that Mr. Munson does not own any trademark rights in the cover photograph of Jonathan Livingston Seagull.  But Plaintiffs explained in their Response that they are not asserting trademark rights in the cover photograph, but rather are asserting trade dress rights in the book cover.  The Court therefore does not consider whether Mr. Munson owns any trademark rights in the cover photograph.

The following portions of the LPA make clear that the LPA only licensed <u>motion picture rights</u> and did not assign all trademark and copyrights in <u>JLS</u>:

- The LPA states that the Owner (Bach) "sells and assigns to the Purchaser [(Bartlett)] forever **motion picture rights** (including all silent, sound, talking and musical motion picture rights in all languages) for the entire world in and to that certain novel written by Richard Bach . . . entitled "Jonathan Livingston Seagull" including all of the contents thereof, all of the characters therein, all present adaptations and revisions thereof and the idea, plot, format, and theme thereof, and in and to the copyright thereof and all renewals and extensions of said copyright all of the foregoing being herein referred to as the 'property.'" (LPA ¶ 1) (emphasis added).

- Included in the "**motion picture rights** . . . sold and assigned to the Purchaser" were (a) the rights to make, produce, reproduce, distribute, televise, translate, and secure copyrights for **motion pictures** (LPA ¶ 2(a)-(g)); (b) the right to use the title "Jonathan Livingston Seagull" as the title of the motion picture (LPA ¶ 2(h)); and (c) the right to do advertising related to the motion picture. (LPA ¶ 3) (emphasis added).

- Also included in the rights conveyed were "merchandising rights": "All merchandising rights meaning the right to manufacture and sell or otherwise dispose of any object or thing described in the **property** or arising out of, based upon or concerned with the **motion picture** hereunder or the title or titles of the **property** or version of the **motion picture** or the characters thereof or their names or characteristics and to authorize and license others so to do with the right to protect such merchandise end rights by copyright, patent or otherwise in the Purchaser's name or that of its nominee(s)." (LPA ¶ 2(i)) (emphasis added).

- Mr. Bach reserved the following rights:

  - All rights of production and use on the speaking stage (LPA ¶ 4(a)).

  - All publication rights, subject, however, to the publication rights sold and assigned to the Purchaser (LPA ¶ 4(b)).

  - All radio rights, subject to the radio rights sold and assigned to the Purchaser (LPA ¶ 4(c)).

  - Live television rights (LPA ¶ 4(d)).

  - Right to 50% net profits resulting from the agreement (LPA ¶ 11).

  - Motion picture rights in any sequel written by Bach (LPA ¶ 17).

Moreover, all rights not granted to Mr. Bartlett were expressly reserved to Mr. Bach "for his sole use and disposition." (LPA "Rider" V).

Read as a whole, the LPA only transferred limited rights — rights to make, distribute, and advertise a motion picture based on Mr. Bach's book, and rights to merchandising in relation to that motion picture. This interpretation is supported by the provision requiring royalty payments, which

1    suggests a license, not an assignment of the entire interest.  See Blue Magic Products, Inc. v. Blue

2    Magic, Inc., 2001 WL 34098657, *3 (E.D. Cal. 2001) (reasoning that by retaining a security interest

3    under the agreement, plaintiff intended to transfer something less than entire interest in trademark).

4    The Court therefore concludes that under the LPA, Mr. Bach only licensed the rights to use the name

5    and title of Jonathan Livingston Seagull; he therefore still owns the trademarks at issue.  See id. at *2

6    ("The language does not suggest an assignment because it conveys less than Kay's entire interest in

7    the 'Blue Magic' mark.").

8           FLP also argues that the LPA did not include any provision that provided that any goodwill

9    associated with the use of the name or title "Jonathan Livingston Seagull" would inure to Mr. Bach's,

10   not Mr. Bartlett's, benefit.  But Mr. Bach would only have needed to transfer the goodwill associated

11   with Jonathan Livingston Seagull if he had sold the trademarks.  A "trademark has no independent

12   significance apart from the good will it symbolizes."  3 McCarthy, supra, § 18:2; see also Mister

13   Donut of Am., Inc. v. Mr. Donut, Inc., 418 F.2d 838, 842 (9th Cir. 1969) ("The law is well settled

14   that there are no rights in a trademark alone and that no rights can be transferred apart from the

15   business with which the mark has been associated.").  "Good will" is defined as "a business value that

16   reflects the basic human propensity to continue doing business with a seller who has offered goods

17   and services that the customer likes and has found adequate to fulfill his needs."  3 McCarthy, supra,

18   § 2:17.  FLP argues that Mr. Bach did not retain any good will in the marks (i.e., the name and title),

19   and that he therefore no longer owns the marks.  Because the Court concludes that Mr. Bach only

20   licensed the rights to use the name and title, Mr. Bach retained the good will of the marks and

21   Defendants' goodwill argument is unavailing.

            **b.    There are genuine issues of material fact about whether Mr. Bach
                    abandoned his trademark rights through a "naked license."**

22
23          Defendants argue in the alternative that the LPA was a "naked license" through which Mr.

24   Bach abandoned any trademark rights.  The general rule is that a trademark owner who "fails to

25   exercise adequate quality control over [a] licensee" of a trademark creates a "naked license" and

26

thereby abandons the trademark.[5]  Barcamerica Int'l USA Trust v. Tyfiled Imps., Inc., 289 F.3d 589, 596 (9th Cir. 2002).  If the trademark owner abandons the mark, the owner is estopped from asserting rights to the mark.  Id.  The licensor's subjective intent to abandon is irrelevant.  Id.  There is a high threshold for showing abandonment: "the proponent of a naked license theory faces a stringent standard of proof."  Id. (internal quotation marks omitted).  Quality control may be shown expressly through the terms of the contract, or informally, through the practices of the contracting parties: "There need not be formal quality control where the particular circumstances of the licensing arrangement [indicate] that the public will not be deceived. . . . Indeed, courts have upheld licensing agreements where the licensor is familiar with and relies upon the licensee's own efforts to control quality."  Id.

        In this case, it is unclear whether Mr. Bach retained adequate quality control over the trademarks.  In terms of the LPA itself, there is no express "quality control" provision.  Plaintiffs point to three provisions that they assert demonstrate that Mr. Bach retained quality control over the mark:

• 	 Reservation of "droit moral" or "moral rights" (LPA ¶ 2(j)).

• 	 The agreement that Mr. Bach would "establish and protect the validity of the rights herein sold and assigned if they are attacked or appropriated by others." (LPA ¶ 6).

• 	 In a contemporaneously executed agreement, Mr. Bach reserved the right to veto any change in the title of the movie from Jonathan Livingston Seagull and he reserved the right to approve the musical score and the final cut of the motion picture. (Geyman Decl., Ex. 41, ¶ 6).

The first two provisions do not support Plaintiffs' theory that Mr. Bach retained quality control. Federal courts do not recognize "moral rights" to sue for distortion of an author's written work.  See Choe v. Fordham Univ. Sch. of Law, 920 F. Supp. 44, 49 (S.D.N.Y. 1995), aff'd, 81 F.3d 319 (2d Cir. 1996).  And Mr. Bach's right to protect the validity of the rights conveyed to Mr. Bartlett when those rights are attacked or appropriated by others has nothing to do with quality control.  But the last provision, which reserved to Mr. Bach the right to veto any change in the title of the movie and

---

        [5]      The Lanham Act provides that a mark is "abandoned" "when any course of conduct of the owner . . . causes the mark . . . to lose its significance as a mark." 15 U.S.C. § 1127.

to approve the musical score and the final cut of the motion picture, did explicitly reserve to Mr.

Bach some control over the quality of the motion picture.

In addition, there are conflicting facts about whether Mr. Bach retained quality control over merchandising through the informal aspects of the licensing arrangement between Mr. Bach and Mr. Bartlett. Adequate quality control may be shown through the relationship between the licensor and licensee, the licensor's trust in the licensee's attention to quality and integrity, and other arrangements that provide assurance that the public will not be deceived. See Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1018 (9th Cir. 1985) (pointing to licensor's "association with [the licensee] for over ten years and his respect for his ability and expertise" as evidence of quality control).

Plaintiffs have documented several informal arrangements that suggest that Mr. Bach maintained some quality control over merchandising. First, Mr. Bartlett sent Mr. Bach a written assurance that merchandising under the LPA would be prepared "with taste and distinction." (Geyman Decl., Ex. 43). In that same letter, Mr. Bartlett explained that he had hired Virginia Briggs, "one of the finest business women in the West," to coordinate the merchandising business, and that "[s]he is one of the people to whom Jonathan has spoken simply and clearly, and she is dedicated and committed to what we are doing." (Id.). And in that letter, Mr. Bartlett requested that Mr. Bach set aside two weeks of time to see the first cut of the motion picture and "discuss fully [Mr. Bach's] reactions to that cut" and then to watch the final cut and "check music and sound, etc." (Id.). And Virginia Briggs stated in a declaration that she had been in consultation with Mr. Bach and his partner Elanor Friede regarding administration of the merchandising rights. (Geyman Decl., Ex. 34). Ms. Briggs stated that she attended a meeting with Mr. Bach and Ms. Friede in which she "set out our program for merchandising the Jonathan image and our coordinated plan." (Id.) She stated that she kept Mr. Bach and/or Ms. Friede "apprised of the progress of our merchandising plans and they never questioned our judgment or decisions." (Id.)

FLP points to the fact that Mr. Bach admitted in deposition that he had no quality control over Mr. Bartlett's use of Jonathan Livingston Seagull in merchandising. Mr. Bach stated in

deposition that "[o]nce the contract [with Mr. Bartlett] was signed, I had no control [over the quality of goods associated with <u>Jonathan Livingston Seagull</u>]." (McDougall Decl. ¶ 3, at 43). FLP also argues that Mr. Bach's assertion that he and Mr. Bartlett had a "close working relationship" regarding the movie and merchandising is belied by the fact that Mr. Bach and Mr. Bartlett were in "heated, acrimonious litigation before JLS merchandise hit the market." (Supp. McDougall Decl., at 79).

Although Mr. Bach's deposition testimony is strong evidence that he did not have quality control over the merchandising, and the litigation history suggests a less than perfect relationship between Mr. Bach and Mr. Bartlett, Plaintiffs have raised a genuine issue of material fact about whether Mr. Bach maintained quality control over Mr. Bartlett's use of the marks. FLP has not met its burden under the stringent standard of proof to show abandonment of the trademark. <u>See Barcoamerica</u>, 289 F.3d at 596.

**E.    Trade Dress Infringement**

"Trade dress" is "the total image of a product and may include features such as size, shape, color, color combinations, texture, or graphics" of packaging and product design. <u>Vision Sports, Inc. v. Melville Corp.</u>, 888 F.2d 609, 613 (9th Cir. 1989) (internal quotation marks and citations omitted). Plaintiffs are asserting trade dress rights in the <u>Jonathan Livingston Seagull</u> book cover design — that is, a white seagull in silhouette against a blue background. Defendants argue that Plaintiffs do not own the trade dress rights, and that the mark has not acquired secondary meaning. Defendants also argue that Plaintiffs' trade dress is generic.[6]

**1.    Ownership of Trade Dress Rights**

FLP argues that Plaintiffs do not own their trade dress rights because the book publisher — Simon & Schuster — holds them. Plaintiffs do not dispute that Simon & Schuster owned the trade

---

[6]    The Court does not address Defendants' "genericness" argument because it was raised for the first time in Defendants' reply brief. It is well established in this circuit that courts will not consider new arguments raised for the first time in a reply brief. <u>Lentini v. Cal. Ctr. for the Arts, Escondido</u>, 370 F.3d 837 n.6 (9th Cir. 2004).

dress rights in the book cover; but Plaintiffs assert that Simon & Schuster assigned to Plaintiffs any and all rights that it had in the trade dress. Indeed, on April 27, 2006, Simon & Schuster conveyed its interest in any trademarks or trade dress in <u>Jonathan Livingston Seagull</u> to Mr. Bach and Mr. Munson. (<u>See</u> Geyman Decl., Ex. 44). And in May 2006, the heirs of the book cover designer, Joan Stoliar, conveyed to Plaintiffs their rights in and to any trademark and trade dress rights relating to the book. (Geyman Decl., Ex. 45).

Defendants argue that the assignments from Simon & Schuster and Joan Stoliar do not ameliorate the ownership problem because (a) no rights can be transferred apart from the business with which the mark has been associated, (b) assignment for purposes of litigation that confers only interest in financial gain are not protected, and (c) nunc pro tunc assignments do not confer standing retroactively.

Defendants also argue that Simon & Schuster abandoned its trade dress rights in the cover of the book by not exercising adequate quality control over the book cover design. (Supp. Brief. 5). Simon & Schuster admitted in deposition that it did not require foreign licensees to use the domestic <u>Jonathan Livingston Seagull</u> cover design. (Second Supp. McDougall Decl. at 53-56). And Simon & Schuster admitted in deposition that its foreign licensees were not required to obtain Simon & Schuster's approval of the foreign cover design for the book. (<u>Id.</u>). Plaintiffs contend that the U.S. publishers (Macmillan, Avon, and their successor Simon & Schuster) have "exercised strict control to ensure that all of the millions of copies of the book published [in the U.S.], since the book first came out in 1970 have had the same famous cover design that FLP has copied in its own promotional and marketing materials that are confusingly similar." (Supp. Mem. at 9). Plaintiffs cite in support Simon & Schuster's deposition testimony that "the trade dress would be a white seagull in the form that's shown on the cover, in that soaring type of motion on a dark or light blue background" and Simon & Schuster's statement that it would pursue trademark infringement against the author or publisher of another book that looked like <u>Jonathan Livingston Seagull</u>. (Phillips Decl. at 153). This evidence raises a question of fact about whether the publisher abandoned the trade dress rights.

In terms of the goodwill issue, Plaintiffs point out that the goodwill with which the trade dress of the book is associated includes Plaintiffs' goodwill as the author and photographer of the book that uses the trade dress. Thus, Simon & Schuster's assignment is consistent with "[t]he purpose behind requiring that goodwill accompany the assigned mark[, which] is to maintain the continuity of the product or service symbolized by the mark and thereby avoid deceiving or confusing consumers." E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1289 (9th Cir. 1992).

Plaintiffs have standing to sue for trade dress infringement regardless of whether they own or owned the trade dress rights. Section 43(a) of the Lanham Act permits "any person who believes that he or she is likely to be damaged" by the proscribed conduct to bring a civil action. 15 U.S.C. § 1125(a). As the Ninth Circuit has explained, a plaintiff only needs to demonstrate a "commercial interest in the misused mark" to satisfy the liberal standing requirement of the Lanham Act. Waits v. Frito-Lay, Inc., 978 F.2d 1093, 1109 (9th Cir. 1992); see also Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc., 407 F.3d 1027, 1037 (9th Cir. 2005) (explaining that under the "false association" prong of section 43(a) of the Lanham Act, "a plaintiff need only allege commercial injury based upon the deceptive use of a trademark or its equivalent to satisfy standing requirements"). Here, Plaintiffs' commercial interests in the misused mark are the actual damages and profits for which FLP is potentially liable based on its violations of Plaintiffs' trademark rights, including royalties FLP should have paid to Plaintiffs. Because Plaintiffs have a right to royalties from others' use of the Jonathan Livingston Seagull mark and trade dress, Plaintiffs have standing to sue under section 43(a) of the Lanham Act regardless of whether they technically own the trade dress at issue.

**2.      Secondary Meaning**

In an action for infringement of unregistered trade dress under § 43(a) of the Lanham Act, "a product's design is distinctive, and therefore protectible, only upon a showing of secondary meaning." Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 216 (2000). Whether trade dress has acquired secondary meaning is a question of fact. Vision Sports, Inc. V. Melville Corp., 883 F.2d 609, 614 (9th Cir. 1989). Such meaning occurs when, "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself." Wal-

1   Mart Stores, 529 U.S. at 211 (quoting Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 851 n.11

2   (1982)).  The Ninth Circuit defines "secondary meaning" as "the mental association by a substantial

3   segment of consumers and potential consumers 'between the alleged mark and a single source of the

4   product.'" Levi Strauss & Co v. Blue Bell, Inc., 778 F.2d 1352, 1354 (9th Cir. 1985) (quoting in part

5   1 McCarthy, supra, §§ 15:2 at 659 and 15:11(B) at 686)).  Some of the factors to be considered in

6   determining whether secondary meaning has been achieved include: (1) whether actual purchasers of

7   the product bearing the claimed trademark associate the trademark with the producer; (2) the degree

8   and manner of advertising under the claimed trademark; (3) the length and manner of use of the

9   claimed trademark; (4) whether use of the claimed trademark has been exclusive; (5) evidence of

10  sales, advertising, and promotional activities; (6) unsolicited media coverage of the product; and (7)

11  attempts to plagiarize the mark. See First Brands Corp. v. Fred Meyer, Inc., 809 F.2d 1378, 1383

12  (9th Cir. 1987); Levi Strauss, 778 F.2d at 1358; Thompson Medical Co. v. Pfizer Inc., 753 F.2d 208,

13  217 (2d Cir. 1985).

14          In this case, Plaintiffs have proffered enough evidence to surpass summary judgment on the

15  question of secondary meaning.  Plaintiffs have submitted, and FLP does not dispute, that Jonathan

16  Livingston Seagull is one of the most widely read novels of all time.  Jonathan Livingston Seagull has

17  sold over thirteen million copies in English and has never been out of print, spent 38 weeks at

18  Number 1 on the New York Times best-seller list, was featured on the cover of Time magazine, and

19  has been translated into more than twenty languages. (Geyman Decl., Exs. 2-8)  Plaintiffs also point

20  to the fact that FLP intentionally plagiarized the Jonathan logo and used it to attract and retain its

21  distributors and to motivate them to sell its products.  For example, FLP used the same image of a

22  white seagull on a blue background, and called that logo "Jonathan," on its sales folders, banners,

23  flags, and website. (Geyman Decl., Exs. 13, 14, 16, 17, 30)  And, throughout its literature, FLP has

24  stated that it chose the Jonathan Livingston Seagull logo because the philosophy of the company is

25  based on Plaintiffs' book. (Id., Ex. 16)  Indeed, it is apparent from the evidence that FLP used the

26  "Jonathan" logo because that logo evokes Plaintiffs' book and the story of Jonathan Livingston

Seagull (i.e., the mark's secondary meaning).

ORDER - 17

1   The parties dispute whether Plaintiffs have consistently used the same trade dress of the book.

2   The parties appear to agree that all U.S. editions of the book have a consistent trade dress.  Plaintiffs

3   have also provided copies of nine foreign book covers with the same cover design. (Geyman Decl.,

4   Ex. 28).  But FLP points to copies of twenty-seven foreign book covers with different cover designs.

5   (McDougall Decl. at 434-60).  And Defendants point to the cover of the U.S. audio recordings, JLS

6   movie soundtrack, and videocassette of the movie that all use different cover designs. (McDougall

7   Decl. at 461-63).

8   The fact that Plaintiffs have used other cover designs to identify the book is not fatal to their

9   secondary meaning argument.  As the Third Circuit explained in Rose Art Indus., Inc. v. Swanson,

10  235 F.3d 165, 174 (3d Cir. 2000), "the fact that [a company] packages the same product in several

11  different types of packaging does not prevent [the company] from seeking trade dress protection for

12  one of these packaging designs."  Similarly, Plaintiffs may still seek trade dress protection for the

13  image of a white seagull on a blue background even though some of the Jonathan Livingston Seagull

14  books and other related products utilized a different cover design.  See id.

15  Defendants also argue that any trade dress here does not identify a "single source" because

16  there are two authors (Bach & Munson), a publisher, cover designer, and at least one other company

17  that are associated with the trade dress.  "The source-identification function of a mark may be

18  destroyed by widespread and uncontested use of the mark by those other than the mark holder."

19  Cairns v. Franklin Mint Co., 107 F. Supp. 2d 1212, 1216-17 (C.D. Cal. 2000) (concluding that

20  Princess Diana's image had lost any significance as a mark identifying a source of a product because

21  of its widespread use by numerous companies).  But in this case, Defendants have not persuasively

22  argued that consumers could not identify a single thing coming from a single source.  As Plaintiffs

23  point out, Defendants have not cited any cases stating that dual authorship of a book deprives the

24  authors of trade dress rights.  And Defendants have not cited any cases holding that an author of a

25  creative work cannot be the "single source" identified by the trade dress of a book cover.  It is only

26

1  logical that the authors of a creative work may serve as a "single source" even when others were

2  involved in the creation of the work.  Defendants have not cited any case suggesting otherwise.[7]

3       Defendants also argue that Plaintiffs have presented little evidence that shows that consumers

4  identify the <u>source</u> of the product, rather than the product itself.  The only evidence Plaintiffs point to

5  in this regard is a survey conducted by one of FLP's experts.  That survey showed that, unaided, 0%

6  of survey participants were able to identify the image of the seagull on a blue background as being

7  related to <u>Jonathan Livingston Seagull</u> or Plaintiffs. (Geyman Decl., Ex. 10).  The survey also showed

8  that only 5% of participants connected the image with <u>Jonathan Livingston Seagull</u> when they were

9  informed that the image was from the cover of a book. (<u>Id.</u>)  Moreover, in their supplemental brief,

10  Defendants point out that in deposition, Simon & Schuster stated that they did not use the book

11  cover to identify Simon & Schuster, but instead as "a marketing tool" to identify the product — the

12  book.

13       Even though some of the evidence suggests that consumers do not identify the trade dress

14  with <u>Jonathan Livingston Seagull</u> or the Plaintiffs, other evidence suggests that the trade dress has

15  acquired secondary meaning.  The Court therefore concludes that there are genuine issues of material

16  fact on the issue of secondary meaning.

17  **F.     Likelihood of Confusion**

18       Finally, Defendants argue that Plaintiffs cannot meet their burden on the second element of

19  their section 43(a) claim — likelihood of consumer confusion.  The "mere possibility that consumers

20  may be misled is insufficient to prevail on an endorsement claim." <u>Newton v. Thomason</u>, 22 F.3d

21  1455, 1461 (9th Cir. 1994).  Likelihood of confusion, like secondary meaning, is an inherently factual

22  issue. <u>See Downing v. Abercrombie & Fitch</u>, 265 F.3d 994, 1008 (9th Cir. 2001) ("The Lanham

23  Act's 'likelihood of confusion' standard is predominantly factual in nature . . . .  Thus, summary

24

25       [7]     Defendants also contend that a Hong Kong based company uses the same <u>Jonathan

26  Livingston Seagull</u> logo at its corporate logo.  Although the fact that another company uses the logo
suggests that the image has lost its significance as a source-identifying mark, its use is presumably
"contested."

1   judgment is inappropriate when a jury could reasonably conclude that there is a likelihood of

2   confusion.").

3          Plaintiffs point to three pieces of evidence to support their assertion that FLP's use of the

4   name, title, and trade dress of Jonathan Livingston Seagull has created a likelihood of confusion

5   about whether FLP has the endorsement, permission, or approval of Plaintiffs to use those marks or

6   some other affiliation or association with Plaintiffs.  First, Plaintiffs point to the declaration of one of

7   FLP's distributors, Saskia Martherus, who stated:

8          As a distributor of Forever Living Products, I was aware of the many ways that the
           company referred to Jonathan Livingston Seagull the book and Jonathan Livingston
9          Seagull the character. . . .  I assumed, based on the company's frequent use of the name
           "Jonathan" and of the book Jonathan Livingston Seagull, that Forever Living Products
10         had the permission of the people who owned the rights to the book for its extensive use
           of the "Jonathan" name.

11  (Martherus Decl.).  Plaintiffs also rely on the deposition testimony of William Ludtke, a former FLP

12  distributor, who stated that he would expect FLP to get permission from Mr. Bach to use the image

13  of the white gull on the blue background as the logo for FLP. (Geyman Decl., Ex. 49).  Finally,

14  Plaintiffs point to the survey of expert Kenneth Hollander in which it was found that 35% of current,

15  former and potential multi-level marketing distributors believed that FLP had permission from the

16  owners of the rights to Jonathan Livingston Seagull for its uses of the marks. (Geyman Decl., Ex.

17  48).

18         Despite this evidence, FLP argues in its reply that Plaintiffs have not met their burden on the

19  confusion prong, and for the first time raise the issue of the Sleekcraft factors.  The Ninth Circuit

20  employs the eight-factor Sleekcraft test to determine whether there is a likelihood of confusion

21  regarding endorsement or approval of, or association or affiliation with, a defendant's use of the

22  mark.  See Downing, 265 F.3d at 1007 (citing AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th

23  Cir.1979)).  The Sleekcraft factors are: (1) the strength of the plaintiff's mark; (2) relatedness of the

24  goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6)

25  likely degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) likelihood of

26  expansion of the product lines. Sleekcraft Boats, 599 F.2d at 348-49.

As Defendants point out, Plaintiffs have not done a prong-by-prong Sleekcraft analysis. Nevertheless, Plaintiffs have made arguments throughout their briefing regarding the strength of the mark, the similarities of the marks, evidence of actual confusion, and Defendants' intent in selecting the mark, which Plaintiffs argue was chosen specifically to evoke Plaintiffs' book in the minds of FLP distributors.

Defendants point to three surveys that suggest that there is no likelihood of confusion. First, Defendants point to surveys by Dr. Ostberg and Mr. Johnson which specifically measured for Lanham Act confusion regarding endorsement, sponsorship, approval, or affiliation or association, and found none. (See Supp. McDougall Decl. pp. 80-115). Notably, in contrast to the Hollander survey, these surveys measured the responses of FLP distributors and general consumers, respectively. Hollander's survey specifically did not test FLP distributors because of potential bias. Defendants also point to the survey by expert Dr. Joachimsthaler which measured public awareness of Jonathan Livingston Seagull and found that it was "extremely low." In that survey, Dr. Joachimsthaler tested awareness of Jonathan Livingston Seagull in three ways: unaided awareness (result: 0% awareness), aided awareness (result: 5% awareness), and highly aided awareness (result: 44% awareness). (Geyman Decl., Ex.10).

Finally, Defendants argue that Plaintiffs' evidence suggests permission, not endorsement or approval. The Court disagrees. The Court may draw an inference that evidence suggesting "permission" suggests endorsement or approval of FLP and/or its products. See Pebble Beach Co. v. Tour 18 I, Ltd., 155 F.3d 526, 543-44 (5th Cir. 1998).

In conclusion, given the testimony of the two distributors, the survey evidence, the similarities of the marks, and the fact that Plaintiffs have proffered evidence strongly suggesting that the Defendants used the name, title, and images associated with Jonathan Livingston Seagull specifically to evoke Plaintiffs' work in the minds of FLP distributors, the Court concludes that Plaintiffs have proffered enough evidence to surpass summary judgment on the issue of likelihood of confusion. Summary judgment on this issue is therefore denied.

1

**CONCLUSION**

2        Because Plaintiffs still own the trademarks and trade dress at issue, and because Plaintiffs have

3 raised genuine issues of fact about the validity of the marks and the likelihood of confusion, the Court

4 DENIES Defendants' motion for summary judgment on Plaintiffs' trademark claims.

5

6        Dated: February 6, 2007.

7

8                                           Marsha J. Pechman
                                            United States District Judge
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26